6

```
 1          Uncertified Rough Draft Transcript Only
 2      Q    And let me just state for the record that
 3   just before this deposition started Mr. Zimmerman
 4   handed to me three documents.  The first one is a
 5   document stamped confidential, Bates label NW 00801.
 6   The next document stamped confidential Bates label
 7   NW 00856.  And the next document also stamped
 8   confidential NW 00863.
 9          MR. ZIMMERMAN:  I believe that's a
10      multi-page document.
11          MR. SMITH:  Yes, it is.
12      Q    Through 00866.
13              And Mr. Zimmerman also told me
14   something about the privilege and I want to make
15   sure that he says it on the record so that I don't
16   say it wrong.
17          MR. SMITH:  But can you tell me what some
18      of these documents were, because I
19      **appreciated, marked and withheld based upon
20      the attorney/client privilege?
21          MR. ZIMMERMAN:  That's correct.
22              I believe all three documents were
23      withheld from the defense production.  After
24      reviewing those documents, I determined that
25      document Bates stamped NW 00801 should not be
```

```
 1            Uncertified Rough Draft Transcript Only
 2            properly withheld.  And with respect to the
 3            documents NW 00856 and then NW 00863 through
 4            866, defendants are waiving the privilege.
 5       Q    Mr. Auerbach, I have before you the
 6       exhibits that were previously marked 1 through 11.
 7       I have them in a binder before you, the originals.
 8                 Turn, if you would, to Exhibit 1.
 9                 Exhibit Number 1 was previously
10       marked.  It is the Notice of Deposition that is
11       directed to Northwest Company pursuant to Federal
12       Rule of Civile Procedure 30b6.
13                 I would like you to turn to item
14       number 5.  Do you see where it says, quote, Any
15       contention that the contemplated transaction with
16       SIG would have constituted or created a fraudulent
17       conveyance.
18                 Do you see that?
19       A    Yes, I do.
20       Q    Is Northwest contending in this case that
21       if they would have closed the transaction that there
22       would have been some sort of fraudulent conveyance?
23       A    Yes.
24       Q    Can you tell me what the factual basis is
25       for that contention?
```

1       Uncertified Rough Draft Transcript Only

2              MR. ZIMMERMAN:  Mr. Smith, I believe the

3       witness was still in the process of answering

4       your last question.

5       A     What I was going to say was, yes, we felt

6    that there was an absolute certainty that that would

7    be an issue down the road.  Not that the transaction

8    itself was a fraudulent transaction, but that the

9    transaction was -- would be deemed -- could be

10   deemed, could be deemed, a fraudulent transaction if

11   there were issues down the road.

12      Q     Can you tell me what the factual basis is

13   for Northwest's contention that if the transaction

14   would have closed it could have been deemed a

15   fraudulent conveyance?

16      A     The first point of which that this came up

17   was there were conversations in which the idea of a

18   fraudulent transaction, fraudulent conveyance --

19   fraudulent transaction, excuse me, came up in

20   conversations based upon the amount of debt that the

21   company was going to have.

22              And if the company could not support

23   the debt and our creditors would come after us, that

24   the first thing that they would want to do is they

25   would want to come after those who had been enriched

```
 1          Uncertified Rough Draft Transcript Only
 2     by the transaction.  And those who are enriched by
 3     the transaction would have been myself and my
 4     father.  Nobody else would have had any money to go
 5     after.
 6               We had spoken to our attorneys at
 7     Moses & Singer and we had asked them for an opinion.
 8     The opinion from Moses & Singer is that this
 9     transaction would -- when I say -- I have to use the
10     right words -- not constitute a fraudulent
11     transaction, but could very well be considered a
12     fraudulent transaction.
13               We contacted our attorneys,
14     Silverberg, Goldsmith after we spoke to Moses &
15     Singer.  They agreed that the transaction would also
16     be subject to a fraudulent conveyance.
17               After doing that, I believe we spoke
18     to one other attorney, I believe, a friend.  I have
19     to check.  I apologize.  Just indirectly we had
20     asked their opinion and I believe their opinion was
21     the same.
22               After that we contacted Susquehanna
23     and Michael Beer.  We directly spoke to Susquehanna
24     about the issue of the fraudulent transaction.  It
25     was a suggestion of Susquehanna that they felt that
```

10

```
 1          Uncertified Rough Draft Transcript Only
 2     the transaction while possibly could be a fraudulent
 3     transaction, they didn't feel it was a great risk,
 4     but that they would speak to their legal team.
 5               We were told by Dan Werther that they
 6     contacted their legal team --
 7     Q    Mr. Auerbach --
 8     A    I am sorry, I don't remember the name of
 9     their legal group right now.  Anyway, they contacted
10     them and the opinion that came back from their
11     attorneys was that the transaction could be deemed a
12     fraudulent transaction.
13               But Dan Werther stated that they felt
14     it was unlikely that that would happen.  We asked
15     Susquehanna if it was highly unlikely that
16     ^^^there/they would be a fraudulent transaction.
17     Would they indemnify us from a fraudulent
18     transaction down the road.
19               They went back to their attorneys or
20     whomever they speak to at Susquehanna and the answer
21     was no.  That although it was unlikely, they would
22     not indemnify us.
23               We were advised by Silverberg
24     ^^^Stonehall & Goldsmith and we were advised by
25     Moses & Singer that in lieu of that we would be
```

```
 1          Uncertified Rough Draft Transcript Only
 2    liable if anything happened.  What we explained to
 3    Susquehanna was that, is that everybody said at
 4    Susquehanna that it probably wouldn't happen, but in
 5    the end if it did happen, the only people who would
 6    be brought in would be Ross and Shay.  And that's
 7    not something we could live with.
 8               We went back one more time and said
 9    to them, if you are so certain, then just give us
10    the indemnification.  And their attorneys would not
11    let them do it.  Our opinion at that point was if
12    Susquehanna's attorneys, the people who are creating
13    the deal, would not indemnify us, then there must be
14    a incredibly strong possibility that this really was
15    possibly in the future to be deemed a fraudulent
16    transaction.
17         Q    Who were the people at Susquehanna that
18    you were speaking to about this?
19         A    Dan Werther.
20         Q    Anyone else?
21         A    Scott might have been involved, but I
22    don't know exactly.
23         Q    You have no memory of discussions with him
24    about this?
25         A    Scott most likely was involved in
```

```
 1          Uncertified Rough Draft Transcript Only
 2     discussions in that he was in the room in many of
 3     these discussions.  I just can't say with definite
 4     certainty that he was involved, but it was Dan
 5     Werther who came back with the feedback from their
 6     attorneys.
 7          Q    Who from Moses & Singer told you that this
 8     could be a fraudulent conveyance?  What's the name
 9     of the lawyer?
10          A    I apologize.  I just read it a second ago.
11     The name just escapes me.  Maybe we can go back to
12     that and I give you the name a little bit later
13     today.
14          Q    Is it on these documents that were given
15     to me by your lawyer today?
16          A    I am hoping so.  Steven Glaser.
17          Q    Tell me what exactly Mr. Glaser told you.
18          A    Mr. Glaser had stated that the transaction
19     could and most likely would be deemed a fraudulent
20     transaction if we were unable to service the debt
21     and our creditors came after us.  And as I stated
22     before, that historically -- and those may not be
23     his exact words -- but in the past the creditors
24     would have to go after the only people who would
25     have funds.  And we would be the only people who at
```

13

```
 1        Uncertified Rough Draft Transcript Only
 2   that point would have any money.
 3        Q     What was the financial condition of
 4   Susquehanna at that time?
 5        A     Excellent, as far as we knew.
 6        Q     Was there any consideration given that if
 7   these creditors made allegations relating to
 8   fraudulent transfers that Susquehanna could be a
 9   defendant, as well?
10        A     No.  We had asked them for the
11   indemnification, but -- no.
12        Q     Did Mr. Glaser give you this opinion in
13   writing or oral or both?
14        A     Mr. Glaser gave it verbally.  And there
15   might have been a correspondence to Shay.
16        Q     Do you remember any such correspondence?
17        A     When I had gone through my notes, I didn't
18   see the correspondence.  I know it was given
19   verbally.
20        Q     When did Mr. Glaser tell you this?
21        A     On or about the same time as ^^Shelly
22   Silverberg, because we went to Silverberg after we
23   spoke to Glaser.  So you are probably looking at
24   June.
25        Q     June?
```

1          Uncertified Rough Draft Transcript Only

2      A      Approximately.

3      Q      So you were getting legal advice from your

4   lawyers in June of 2006 that the manner in which the

5   transaction was structured as of June created

6   exposure for fraudulent conveyance claims?

7      A      It would be sometime in the period --

8   since I don't have the exact date, why don't we say

9   between June and July.  In other words, between the

10  middle of June and the middle of July to be

11  specific, then the answer would be yes.

12     Q      Any other lawyers at Moses & Singer who

13  provided this advice?

14     A      At that point, no.

15     Q      When did Susquehanna tell you that they

16  would not provide the indemnification that you were

17  looking for?

18     A      I believe it would have been after this.

19  So you probably would have been looking at, I

20  believe, in August.  It could be --

21     Q      When in August?

22     A      I don't know.  It could be the end of July

23  or the beginning of August, but I don't have a date.

24     Q      Who from Silverberg, Goldsmith advised you

25  that the contemplated transaction could be subject

```
 1          Uncertified Rough Draft Transcript Only

 2     to fraudulent conveyance claims?

 3          A     It was Michael Goldsmith.  And then Shelly

 4     Silverberg had concurred with what Michael Goldsmith

 5     had said.  There were conversations with both.

 6          Q     When did those conversations take place?

 7          A     Again, I would tell you the middle --

 8     somewhere between mid-June and mid-July.

 9          Q     What did Mr. Goldsmith say -- I am

10     assuming he told you?

11          A     I was in the office -- as we produced just

12     recently, that there was some correspondence back

13     and forth.

14          Q     Mr. Auerbach, did he tell you?

15          A     Yes.

16          Q     What did Mr. Goldsmith tell you about this

17     fraudulent conveyance?

18          A     That the transaction could easily be

19     deemed a fraudulent conveyance.

20          Q     Did he tell you why?

21          A     Yes.

22          Q     What did he say?

23          A     Michael Goldsmith had looked into the

24     matter and based upon what Michael had looked into,

25     what research he had done, he felt -- he agreed that
```

16

```
 1        Uncertified Rough Draft Transcript Only
 2    it could be construed as a fraudulent conveyance.
 3        Q    Did he tell you why?
 4        A    He concurred with Michael.  I had spoken
 5    to Michael Goldsmith about it previously.
 6        Q    Mr. Auerbach, did Mr. Goldsmith share with
 7    you his rationale for his conclusion?
 8        A    That he agreed with what Mr. Michael
 9    Goldsmith had stated, yes.
10        Q    I am asking you about Mr. Goldsmith.
11                    (Record read back.)
12        A    Mr. Goldsmith felt, again, that with the
13    amount of debt that the company was going to incur,
14    if anything was to go wrong with the company, if the
15    company for any reason couldn't function going
16    forward in any way and if the company was unable to
17    go forward, that it would be the Auerbaches, Shay
18    and Ross, that would be held responsible by the
19    creditors.
20                In addition to that, the other issues
21    were, is that with the debt that was proposed to go
22    on to the company, that the company would need far
23    more operating capital than stated by Susquehanna to
24    run the business, because Susquehanna's model did
25    not take into account the additional credit demands
```

1          Uncertified Rough Draft Transcript Only

2    that the debt would have put on the company outside

3    of the simple servicing of the debt, as Susquehanna

4    had a difficult time approaching how they were going

5    to determine what that debt load would be.  Which we

6    anticipated to be somewhere between -- probably

7    somewhere between $4 to $6 million.

8          MR. ZIMMERMAN:  Ross, please listen to the

9          questions that are being asked and answer the

10         questions.

11         THE WITNESS:  Okay.

12    Q    Who were the entities that were the

13    creditors that possibly could have brought these

14    claims?

15    A    The creditors would have been anyone that

16    we were purchasing materials from.  The creditors

17    could have been CIT.

18    Q    Did anyone ask CIT what their view was

19    about the possibility of a fraudulent conveyance

20    plan?

21    A    I do not remember if we did.

22    Q    Well, if in fact CIT was not asked, do you

23    know why?

24         MR. ZIMMERMAN:  Objection.

25    A    No.

1        Uncertified Rough Draft Transcript Only

2        Q    CIT was prepared to loan, I think, close

3    to $20 million, right?

4        A    Yes.

5        Q    And the concern was that there could be a

6    fraudulent conveyance claim in the event that the

7    company couldn't service the debt and repay CIT,

8    correct?

9        A    Yes.

10        Q    Did anyone ask CIT whether they had any

11    concerns about whether or not this transaction was a

12    fraudulent conveyance?

13        A    CIT is one member.  CIT also has a lead on

14    the inventory.  CIT has first position on

15    everything.  If something were to happen to the

16    Northwest Company, the one entity that has the very

17    best chance of remaining ^^^hold/whole would be CIT.

18        Q    So the concern about fraudulent conveyance

19    really wasn't with respect to CIT?

20        A    It's somewhat related to CIT.  It's not

21    the major issue.

22        Q    What was the major issue?

23        A    The major issue would be suppliers and

24    licensors.

25        Q    And as of the date of the proposed

1          Uncertified Rough Draft Transcript Only

2     transaction -- let's just say September of '06 --

3     how many suppliers were owed money for company

4     payables beyond 30 days?

5          A     From our company?

6          Q     Yes.

7          A     I don't know.

8          Q     Were any?

9          A     I have no idea.  I am sure somebody was.

10         Q     Was the company in default with respect to

11    any obligations at that time?

12         A     No.

13         Q     So the concern about a fraudulent

14    conveyance was that prospective vendors who would

15    supply goods or material to the company may not get

16    paid and, therefore, they would be able to somehow

17    bring a claim against you or your father?

18              MR. ZIMMERMAN:  Objection.

19         A     Vendors.  Licensors.  Anyone that

20    Northwest owed money to if we had gone into

21    bankruptcy.

22         Q     Let's talk about the licensors.  Which

23    licensors were you concerned about?

24         A     All.

25         Q     How many were there at that time?

1      Uncertified Rough Draft Transcript Only

2    A    Between 30 and 40.

3    Q    What was the potential exposure with the

4  licensors?

5    A    Millions.

6    Q    How many millions?

7    A    I don't know.  Many millions.

8    Q    Did you ever do the calculation?

9    A    At the time, we looked at it briefly.  If

10  you want me to give you a minimum threshold, you

11  were looking at $10 million -- $7 to $10 million.

12    Q    Let's talk about Disney.  What were the

13  termination provisions that were contained in the

14  license agreement, do you know?

15    A    When you say "termination," in what way

16  termination?

17    Q    If you wanted to terminate the license

18  with Disney, did the licensee have a right to do it?

19    A    Did the licensee have a right to

20  terminate?

21    Q    Yes.

22    A    I do not believe so.

23    Q    Did the licensor have a right to do it?

24    A    Yes.

25    Q    When was the last time that you looked at

1          Uncertified Rough Draft Transcript Only

2     the license agreements?

3          A     For Disney?

4          Q     Yes.

5                MR. ZIMMERMAN:  Objection.  Just to be

6          clear, the current one?  The existing license?

7          The license that might be in place at the time

8          of the discussions?  I am just trying to make

9          sure everybody is talking about the right

10         issue.

11         Q     When was the last time that you looked at

12    any license agreement relating to Disney?

13         A     The last license agreement I looked at

14    related to Disney was the extension -- our latest

15    extension.

16         Q     When was that that you looked at it?

17         A     Six months ago.

18         Q     Now, do you know if the lawyers from Moses

19    & Singer or from Goldsmith reviewed the license

20    agreements -- these 30 or 40 license agreements in

21    connection with their fraudulent conveyance

22    analysis?

23         A     No.

24         Q     They didn't?

25         A     No, they didn't.

```
 1          Uncertified Rough Draft Transcript Only
 2     Q    And as you sit here today -- are the
 3  license agreements different?
 4     A    You mean, are all the terms and conditions
 5  different?
 6     Q    Yes.
 7     A    Some of the terms and conditions are
 8  different.
 9     Q    Are there any in which the licensee is
10  permitted to terminate the agreement, for example,
11  on 30 days' notice?
12     A    Quite possibly could.
13     Q    How many?
14     A    I don't know.  And if we terminate, I
15  would believe that we would owe the royalties.  I am
16  not aware of any provision in any license we have, I
17  am not aware of any agreement that allows the
18  licensee, not the licensor, but the licensee to
19  terminate without paying its obligation.
20     Q    Is that sort of a best guess that we are
21  getting at here?
22          MR. ZIMMERMAN:  Objection.
23     A    In all of the licenses I have read from
24  the companies in which we license, there are
25  provisions in the license that give the licensors
```

```
 1          Uncertified Rough Draft Transcript Only
 2     the ability to cancel -- to terminate under certain
 3     conditions the license agreements with the company.
 4               I have never in my belief read a
 5     clause that allows them to terminate and give up
 6     their rights to collect all monies due within the
 7     term of the agreement.  I have read a few contracts
 8     where the licensee has the ability to get out of the
 9     contract, but I have never -- again, I do not
10     remember or recall ever reading where the licensee
11     can terminate and walk away from its financial
12     obligations in the contract.  That's my belief.
13          Q     Now, the vendors.  Who were your largest
14     vendors in, say, September of 2006?
15          A     Itochu.  The largest vendors would be
16     Itochu, 1888 Mills, would be our largest.
17          Q     What did Itochu do?  What did it supply to
18     the company?
19          A     Textile products, products we sold.
20          Q     What were the terms and conditions under
21     which you did business?
22               MR. ZIMMERMAN:  Objection.
23          A     Net 60 days LDP.
24          Q     Were there any alleged credit in place?
25          A     No.
```

```
1              Uncertified Rough Draft Transcript Only
2         Q    And 1888 Mills?
3         A    Same terms.
4         Q    Are they also a textile producer?
5         A    Yes, they are.
6              MR. SMITH:  Let me just state, I am going
7         to, at the lunch break -- just so you are not
8         surprised, now that the decision has been made
9         about the attorney/client waiver here -- we are
10        going to ask to take Glaser's deposition.  And
11        I think we already have Sheldon lined up, but
12        we may want to run through Goldsmith, too,
13        since apparently he is the initial opiner.
14             I am assuming you will take a subpoena on
15        behalf of your partner?
16             MR. ZIMMERMAN:  Yes.
17             MR. SMITH:  Can I serve Goldsmith through
18        you, too?
19             MR. ZIMMERMAN:  I'm not authorized on his
20        behalf to accept anything.
21             MR. SMITH:  We will mark as the next
22        Exhibit, which will be Exhibit 12, a document
23        that you received from Mr. Beer.
24             For the record, this is an e-mail dated
25        January 14, 2005 from Mr. Beer with an
```