0721NEWT.TXT

                                                    1
 1    --------------------------------------------------
 2       REALTIME AND INTERACTIVE REALTIME TRANSCRIPT
                    ROUGH DRAFT DISCLAIMER
 3    --------------------------------------------------
                       IMPORTANT NOTICE:
 4                    AGREEMENT OF PARTIES
      --------------------------------------------------
 5
      We, the party working with realtime and rough
 6    draft transcripts, understand that if we choose to
      use the realtime rough draft screen or the
 7    printout, that we are doing so with the
      understanding that the rough draft is a
 8    noncertified copy.

 9    We further agree not to share, give, copy, scan,
      fax or in any way distribute this realtime rough
10    draft in any form (written or computerized) to any
      party.  However, our own experts, cocounsel and
11    staff may have limited internal use of same with
      the understanding that we agree to destroy our
12    realtime rough draft and/or any computerized form,
      if any, and replace it with the final transcript
13    upon its completion.

14    Case:  New Trail Capital, et al.
      v. The Northwest Company, Inc.
15
      Date:  July 21, 2008
16
      REPORTER'S NOTE:
17    Since this deposition has been realtimed and is in
      rough draft form, please be aware that there may
18    be a discrepancy regarding page and line number
      when comparing the realtime screen, the rough
19    draft, rough draft disk, and the final transcript.

20    Also please be aware that the realtime screen and
      the noncertified rough draft transcript may
21    contain untranslated steno, reporter's note in
      double parentheses, misspelled proper names,
22    incorrect or missing Q/A symbols or punctuation,
      and/or nonsensical English word combinations.  All
23    such entries will be correct on the final,
      certified transcript.
24
          Court Reporter's Name:  SUSAN B. RATNER
25        Firm Name:  REPORTERS CENTRAL


              REPORTERS CENTRAL * (212) 594-3582


                                                    2

0721NEWT.TXT

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - x

NEW TRAIL CAPITAL, a sole        :

proprietorship, and MICHAEL BEER,   :

    Plaintiffs,        :

  -against-        : 07 Civ. 9679

THE NORTHWEST COMPANY, INC.,        :   (LAK)(RLE)

    Defendant.        :

- - - - - - - - - - - - - - - - - - x

    July 21, 2008

    10:10 a.m.


  Deposition of SHELDON SILVERBERG, taken by

Plaintiffs, held at the law offices of Silverberg

Stonehill Goldsmith & Haber, P.C., 111 West 40th

Street, New York, New York, before Susan B.

Ratner, a Shorthand Reporter and Notary Public

within and for the State of New York.


   REPORTERS CENTRAL * (212) 594-3582


        3


A P P E A R A N C E S:


BLANK ROME LLP

    Page 2

0721NEWT.TXT

Attorneys for Plaintiffs

    The Chrysler Building

    405 Lexington Avenue

    New York, New York 10174

BY:  DAVID D. JENSEN, ESQ.


MOSES & SINGER LLP

Attorneys for Defendant

    405 Lexington Avenue

    New York, New York 10174

BY:  PHILIPPE ZIMMERMAN, ESQ.


SILVERBERG STONEHILL GOLDSMITH & HABER, P.C.,

For the Witness

    111 West 40th Street

    New York, New York 10018

BY:  KENNETH R. SCHACHTER, ESQ.


ALSO PRESENT:

    SHIRA AUERBACH



REPORTERS CENTRAL * (212) 594-3582


4



IT IS HEREBY STIPULATED AND AGREED

Page 3

0721NEWT.TXT

by and between the attorneys for the respective
parties hereto that the filing and sealing of the
within deposition shall be and the same are hereby
waived.

IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form of the
question, shall be reserved to the time of trial.

IT IS FURTHER STIPULATED AND AGREED
that the within deposition may be signed and sworn
to before any officer authorized to administer an
oath with the same force and effect as if signed
and sworn to before the Court.

REPORTERS CENTRAL * (212) 594-3582

                                                    5
1      Sheldon Silverberg - Rough Draft
2   S H E L D O N   S I L V E R B E R G,   having been
3        first duly sworn, stating his business
4        address as Silverberg Stonehill Goldsmith &
5        Haber, P.C., 111 West 40th Street, New York
6        New York 10016, was examined and testified as
7        follows:
8   EXAMINATION BY
9   MR. JENSEN:
10       Q.   Good morning, Mr. Silverberg.

Page 4

0721NEWT.TXT
11        A.    Good morning.

12        Q.    My name is David Jensen.  I represent

13   the plaintiffs in this case, Michael Beer and New

14   Trail Capital.  I am taking your deposition today

15   in connection with my client's suit against The

16   Northwest Company.

17             I presume that you know this routine,

18   but I will go ahead and walk through the

19   formalities.

20             I will be asking you a series of

21   questions that you need to answer to the best of

22   your knowledge.

23             If you don't understand a question,

24   please tell me so.

25             Do you understand that?


                REPORTERS CENTRAL * (212) 594-3582


                                              6
1        Sheldon Silverberg - Rough Draft

2        A.   I do.

3        Q.    During your deposition objections may be

4    posed by your attorney or, for that matter, by

5    Mr. Zimmerman in response to my questions.

6             For this reason, so that the court

7    reporter can accurately record your testimony, I

8    would ask that you please wait until the question

9    is finished before answering.

10            If your attorney makes an objection,

11   allow him to make the objection and then answer

12   the question, unless you are instructed otherwise.

13            Do you understand that as well?

0721NEWT.TXT

14     A.   I do.

15     Q.   Throughout this deposition I will be

16  referring to The Northwest Company probably as

17  "Northwest," and when I do so, I will be also

18  referring to the officers and directors and

19  employees of Northwest, including specifically,

20  without limitation, Shay Auerbach and Ross

21  Auerbach and Michael Busser.

22       Do you understand that as well?

23     A.   Michael who?

24     Q.   Busser.

25       I understand that he is the CFO of the

REPORTERS CENTRAL * (212) 594-3582

7

1    Sheldon Silverberg - Rough Draft

2  company.

3     A.   I don't know that name.

4     Q.   For the record, Mr. Silverberg, could

5  you state your name?

6     A.   Sheldon Silverberg.

7     Q.   How old are you?

8     A.   79.

9     Q.   Have you ever had your deposition taken

10  before?

11     A.   Yes, I have.

12     Q.   Can you tell us when that was?

13     A.   The last time was about six months ago

14  or seven months ago.

15     Q.   What did that deposition pertain to?

16     A.   A medical malpractice case.

0721NEWT.TXT

17          Q.    What is your current occupation?

18          A.    I come into this office on a part-time

19   basis.

20          Q.    To clarify, you are an attorney at this

21   office?

22          A.    Yes, I am.

23          Q.    "This office" is Silverberg Stonehill

24   Goldsmith & Haber, P.C.?

25          A.    Yes, sir.


                REPORTERS CENTRAL * (212) 594-3582


                                                          8

1          Sheldon Silverberg - Rough Draft

2          Q.    For convenience, I would like to refer

3    to Silverberg Stonehill Goldsmith & Haber as

4    "Silverberg Stonehill" for the remainder of the

5    deposition.

6                How long have you been with Silverberg

7    Stonehill?

8          A.    Sense its inception on January 1, 1978.

9          Q.    What is your role or position at

10   Silverberg Stonehill?

11          A.    President.

12          Q.    Does Silverberg Stonehill have partners?

13          A.    It has other shareholders, yes.

14          Q.    How much do you work now?

15          A.    I come in four mornings a week, but I

16   don't do much work.

17          Q.    Good for you.

18                Did you prepare for your deposition

19   today?

                        Page 7

0721NEWT.TXT

20    A.    Yes.

21        Q.    In connection with that preparation, did

22    you review any documents?

23        A.    When I received the subpoena, I briefly

24    glanced at the letter of intent and the retention

25    letter or the agreement of the plaintiffs in the

REPORTERS CENTRAL * (212) 594-3582

9

1        Sheldon Silverberg - Rough Draft

2    case.

3        Q.    Did you meet with your attorney to

4    prepare for the deposition?

5        A.    Yes, I did.

6        Q.    Did you speak with anyone from

7    Northwest?

8        A.    No.

9        Q.    Is there anyone else that you spoke

10    with?

11        A.    Only the attorney in this room and my

12    son Jay.

13        Q.    The attorney in this room being --

14        A.    Ken and very briefly Michael Goldsmith.

15        Q.    So you did not meet with Mr. Zimmerman?

16        A.    No.

17        Q.    Are you familiar with The Northwest

18    Company?

19        A.    Yes, I am.

20        Q.    How is it that you are familiar with

21    Northwest?

22        A.    Northwest was a client of our office for

Page 8

0721NEWT.TXT

23    many years.

24        Q.    About how long, do you know?

25        A.    At least for the length of time that --


REPORTERS CENTRAL * (212) 594-3582


10

1        Sheldon Silverberg - Rough Draft

2    I am not sure when they were incorporated, but

3    shortly after their incorporation.  It was many

4    years.

5            I don't remember if they were

6    incorporated at the time that we formed this firm.

7        Q.    Would you say prior to the year 2000?

8        A.    Yes.

9        Q.    Are you in charge of billing on matters

10   pertaining to The Northwest Company?

11       A.    Only to the extent of any work that I

12   may have done.

13       Q.    Is there an attorney at Silverberg

14   Stonehill who is the contact person for Northwest?

15       A.    During the time that we were doing work

16   for them, I guess I was the one most frequently in

17   contact, but they were in contact with other

18   people here, too.

19       Q.    Who is it that you liaisoned with at

20   Northwest over the years?

21       A.    Jay and Shay and Ross Auerbach and

22   occasionally some of their employees.

23       Q.    Do you know the Auerbachs in any

24   capacity other than as affiliates of Northwest?

25       A.    Shay Auerbach was my client long before

Page 9

0721NEWT.TXT

REPORTERS CENTRAL * (212) 594-3582

11

```
 1          Sheldon Silverberg - Rough Draft
 2   Northwest went into business and probably for as
 3   long as maybe 40 years.
 4          Q.   Do you know Michael Beer?
 5          A.   Yes, I do.
 6          Q.   How do you know Mr. Beer?
 7          A.   His father, who I met in 1978 or 1949,
 8   is one of my closest friends.
 9               I knew his father before he was born.
10          Q.   So it would be accurate to say that you
11   have, effectively, known Mr. Beer his entire life?
12          A.   Yes.
13          Q.   Are you aware of Michael Beer's suit
14   against Northwest?
15          A.   Yes.
16          Q.   How did you become aware of it?
17          A.   I think that the time he started the
18   suit a summons and complaint may have been sent
19   here.
20               MR. JENSEN:  Off the record.
21               (Discussion off the record.)
22               (Silverberg Exhibit 1, three-page
23          document, the first page being a "Subpoena in
24          a Civil Case," dated 2/5/2008, to Silverberg
25          Stonehill Goldsmith & Haber, P.C., marked for
```

REPORTERS CENTRAL * (212) 594-3582

0721NEWT.TXT

                                                              12
1        Sheldon Silverberg - Rough Draft
2          identification, as of this date.)
3             MR. JENSEN:  Back on the record.
4    BY MR. JENSEN:
5        Q.  Mr. Silverberg, I am handing you a
6    document that we have marked as Silverberg Exhibit
7    1.
8             I would like you to take a look at that
9    and tell us if you recognize it.
10       A.  Yes.
11       Q.  What is it?
12       A.  It's a subpoena to my firm to produce
13   documents.
14       Q.  What is your knowledge of this subpoena?
15       A.  I know that it was served and I know
16   that people in the office went about complying
17   with it.
18       Q.  Did you assist in reviewing any
19   documents for privilege in connection with this
20   subpoena?
21       A.  No.
22       Q.  Are you aware that documents were
23   redacted and/or withheld as privileged?
24       A.  I know that they were examined, but I
25   don't know if anything was withheld.


            REPORTERS CENTRAL * (212) 594-3582


                                                              13
1        Sheldon Silverberg - Rough Draft
2             MR. JENSEN:  Would you mark this
3          document as Silverberg Exhibit 2, please.
                          Page 11

0721NEWT.TXT

```
 4              (Silverberg Exhibit 2, document
 5         three-page bearing the heading "Response to
 6         Subpoena dated February 5, 2008, Issued to
 7         Silverberg Stonehill Goldsmith & Haber,
 8         P.C.," marked for identification, as of this
 9         date.)
10    BY MR. JENSEN:
11         Q.   Mr. Silverberg, I am now handing you a
12    document that we have marked as Silverberg Exhibit
13    2.
14              I would like you to take a look at that
15    and tell us if you recognize it.
16         A.   No, I have never seen this before.
17              MR. JENSEN:  Would you mark this
18         document as Silverberg Exhibit 3, please.
19              (Silverberg Exhibit 3, one-page printout
20         of e-mail string, the top e-mail dated
21         July 26, 2006, to Shay Auerbach and others,
22         from Sheldon Silverberg,  Bates stamped No.
23         NW 00856, marked for identification, ass of
24         this date.)
25    BY MR. JENSEN:
```

REPORTERS CENTRAL * (212) 594-3582

```
                                        14
 1         Sheldon Silverberg - Rough Draft
 2         Q.   Mr. Silverberg, I am now handing you a
 3    document that we have marked as Silverberg Exhibit
 4    3.
 5              I would like you to take a look at that
 6    and tell us if you recognize it.
```

0721NEWT.TXT

      7        A.    Yes, I do.

      8        Q.    Can you tell us what this document is?

      9        A.    It's an exchange of e-mails between Jay

     10    Auerbach and me.

     11        Q.    Am I correct in concluding that you

     12    would not be able to identify this as one of the

     13    documents or as one of the specific documents that

     14    is listed on this privilege log that has been

     15    marked as Exhibit 2?

     16            MR. ZIMMERMAN:  Objection.

     17            You can answer.

     18        A.    I don't understand the question.

     19        Q.    If we could look back at Exhibit 2 --

     20        A.    You are telling me that it's not on here

     21    or it is on here?

     22            MR. JENSEN:  Off the record.

     23            (Discussion off the record.)

     24            (Silverberg Exhibit 4, four-page

     25        memorandum on the stationery of Moses &


                 REPORTERS CENTRAL * (212) 594-3582


                                               15
      1        Sheldon Silverberg - Rough Draft

      2        Singer LLP, dated July 27, 2006, to Shay

      3        Auerbach and Ross Auerbach, from Steven

      4        Glaser, Bates stamped Nos. NW 00863 through

      5        NW 00866, marked for identification, as of

      6        this date.)

      7            MR. JENSEN:  Back on the record.

      8    BY MR. JENSEN:

      9        Q.    Mr. Silverberg, if you could look at
                              Page 13

0721NEWT.TXT

10    Exhibit 2, this appears to be a list of documents;

11    is that correct?

12         A.   Yes.

13         Q.   Would you have any ability to identify

14    the document marked as Exhibit 4 as one of the

15    documents on that list?

16              MR. SCHACHTER:  Objection.

17         A.   Do you want me to go through each one

18    until I find this?

19              I don't understand what you want me to

20    do.

21         Q.   I just want to know if you would know

22    whether or not any of the documents on that list

23    is that document.

24         A.   No, I would not.

25              MR. JENSEN:  Off the record.


REPORTERS CENTRAL * (212) 594-3582


                                                16
1    Sheldon Silverberg - Rough Draft

2              (Discussion off the record.)

3              MR. JENSEN:  Back on the record.

4         Q.   Mr. Silverberg, I am showing you a

5    document that has been marked as Exhibit 4.

6              I would like you to take a look at that

7    and tell us if you recognize it.

8         A.   No, I don't.

9         Q.   To your knowledge, have you ever seen

10    this document before?

11         A.   I don't think so.

12         Q.   Do you have any understanding as to

0721NEWT.TXT

13    whether or not Northwest has waived the

14    attorney-client privilege with regard to the

15    matters that are discussed in these documents that

16    we have marked as Exhibits 3 and 4?

17         A.   Only to the extent of what I have heard

18    here today.

19         Q.   Again, for the sake of keeping the

20    record complete, would I be correct in concluding

21    that you would not be able to identify from the

22    privilege log that has been marked as Exhibit 2,

23    what, if any, documents might pertain to the

24    matters disclosed in these Exhibits 3 and 4?

25              MR. ZIMMERMAN:  Objection.


              REPORTERS CENTRAL * (212) 594-3582


                                                    17
1         Sheldon Silverberg - Rough Draft

2         A.   Please repeat the question.

3         A.   I don't understand the question.

4         Q.   Looking at the document marked as

5    Exhibit 2, the privilege log, do you have any way

6    of knowing what matters are addressed in the

7    documents that are listed on that Exhibit 2?

8         A.   Do I have any knowledge?

9              Say it again, please.

10             (Question read.)

11             MR. SCHACHTER:  He is not asking you to

12        guess.

13        A.   Some of the items that are listed here I

14    think that I saw originally, but I could not tell

15    you what is in each of them, no.

0721NEWT.TXT

16      Q.   Does Exhibit 2 indicate what the nature
17  of any of the documents that are listed upon it --
18           MR. SCHACHTER:  You know, we have
19      produced him here.
20           He is not here to describe documents.
21      There are documents.
22           He has never seen this document.
23           You are now asking him to interpret that
24      document for you.
25           We are not going to spend our time doing

REPORTERS CENTRAL * (212) 594-3582

18

1      Sheldon Silverberg - Rough Draft
2          that.  We are just not.
3              If you have questions about knowledge of
4          things, that is fine.  He is not going to
5          describe his interpretation of documents he
6          has never seen mean.
7              MR. JENSEN:  The only thing that I am
8          trying to establish is that we cannot
9          determine that off the privilege log.
10             MR. SCHACHTER:  So what?
11             He has never seen the privilege log.
12             What is the relevance whether he knows
13         what is on the privilege log?
14             He has never seen it.
15             If you have a document that you want to
16         show to him, fine.
17     Q.   Do you have any knowledge of whether
18  Silverberg Stonehill has produced documents for
                    Page 16

0721NEWT.TXT

19   which the attorney-client privilege has been
20   waived by Northwest?
21       A.   I was told that we complied with the
22   subpoena and produced what we could or should
23   have.
24       Q.   Do you have any knowledge of whether
25   subsequent to Silverberg Stonehill's production of

REPORTERS CENTRAL * (212) 594-3582

19
 1       Sheldon Silverberg - Rough Draft
 2   documents, any subsequent production was made in
 3   light of any waivers of the attorney-client
 4   privilege that thereafter occurred?
 5       A.   No, I do not.
 6       Q.   Do you know about any proposed buyouts
 7   or other equity transactions pertaining to
 8   Northwest?
 9            MR. ZIMMERMAN:  Objection.
10            Do you have a time frame?
11            MR. JENSEN:  Let's say since the year
12       2002.
13       A.   I recall that there was some offer to
14   purchase a small part of the company.
15       Q.   What do you recall about that offer?
16       A.   I think that it was for 10 percent of
17   the company at a very fair price, and I don't know
18   if anything was ever done about it.
19       Q.   Did this in any way pertain to the
20   company known as Susquehanna International Group?
21       A.   No.

0721NEWT.TXT

22          I thought that you meant in addition to

23     that.

24          Q.    Are you familiar with any transactions

25     or proposed transactions that would have involved

REPORTERS CENTRAL * (212) 594-3582

                                                    20

1          Sheldon Silverberg - Rough Draft

2     Susquehanna International Group?

3          A.    Do you mean the one that is the subject

4     of this litigation?

5          Q.    Yes.

6          A.    I certainly had a familiarity with that

7     one.

8          Q.    For sake of convenience, can we agree to

9     refer to Susquehanna International Group as "SIG"?

10          A.    If you would like.

11          Q.    Was Michael Beer involved in this

12     transaction that was proposed or contemplated that

13     involved SIG?

14          A.    Yes.

15          Q.    What was his involvement?

16          A.    He brought Susquehanna to Northwest.

17          MR. JENSEN:  Off the record.

18          (Discussion off the record.)

19          MR. JENSEN:  Back on the record.

20          Q.    Who were the other parties involved in

21     this proposed or contemplated transaction with

22     SIG?

23          A.    What do you mean by "parties"?

24          Q.    Well, who, to your knowledge, was
                    Page 18

0721NEWT.TXT

25      potentially a participant in this transaction?


                REPORTERS CENTRAL * (212) 594-3582


                                                        21
 1         Sheldon Silverberg - Rough Draft
 2         A.    There was a buyer and a seller.  There
 3    were no other parties.
 4         Q.    Who was the buyer?
 5         A.    Susquehanna or eventually they named
 6    some subsidiary or newco.
 7         Q.    Who was the seller?
 8         A.    The seller originally was supposed to be
 9    Shay Auerbach and Ross Auerbach because the
10    initial letter of intent contemplated a purchase
11    of stock.
12         Q.    How did you first learn of this proposed
13    contemplated transaction of SIG?
14         A.    I don't remember.
15         Q.    Do you recall when you first learned of
16    it?
17         A.    When, no.
18         Q.    Were you retained in connection with
19    this proposed or contemplated transaction?
20         A.    Yes.
21               Not formally, but we started to help
22    with it.
23         Q.    To clarify, were you retained, was
24    Silverberg Stonehill retained, were you both
25    retained?

0721NEWT.TXT

                                                    22
1       Sheldon Silverberg - Rough Draft
2           A.   I don't think that there is any
3    difference.
4           Q.   Do you know if there is a retainer
5    letter or some other written agreement that
6    pertains to that retention?
7           A.   I doubt that there is.
8           Q.   Can you tell us generally what work, if
9    any, you performed in connection with this
10   proposed transaction?
11          A.   That I personally performed?
12          Q.   Yes.
13          A.   Initially, I had a number of discussions
14   over a period of time, and then there was a letter
15   of intent that was negotiated and signed, and then
16   very long after that there was a proposed asset
17   purchase agreement, which I attended one meeting
18   about.
19               Thereafter, I did very little.
20          Q.   Besides the work that you did, was there
21   any other work that you know of that Silverberg
22   Stonehill performed in connection with the
23   transaction?
24          A.   Yes.
25               My son Jay attended a meeting in which


              REPORTERS CENTRAL * (212) 594-3582


                                                    23
1       Sheldon Silverberg - Rough Draft

0721NEWT.TXT

2    the proposed asset purchase agreement was

3    discussed, and he took over the matter after that.

4        Then, he and Michael Goldsmith had some

5    discussions after that.

6        Q.    Do you know what a "leveraged buyout"

7    is?

8        A.    Yes.

9        Q.    Would you describe this proposed

10   transaction as a "leveraged buyout"?

11       MR. ZIMMERMAN:  Objection.

12       A.    It seems to have turned out that way,

13   yes.

14       Q.    How would you describe it as it was

15   originally contemplated?

16       A.    It was originally contemplated that

17   Michael had a buyer who was capable of purchasing

18   my client's business on an all-cash basis, and he

19   did not have to borrow any money to do it and to

20   come in and make a deal.

21       Then there was an arrangement where

22   under the letter of intent they intended to buy

23   the stock, but reserve the right to change that,

24   which they finally did without discussion with us,

25   and the presentation of an asset purchase

REPORTERS CENTRAL * (212) 594-3582

24

1        Sheldon Silverberg - Rough Draft

2    agreement.

3        Q.    Have you performed work in connection

4    with similar transactions in the past?

0721NEWT.TXT
```
 5                MR. ZIMMERMAN:  Objection.
 6        A.    I have performed work in connection with
 7    the sales of businesses, but no two of them are
 8    alike.
 9        Q.    How did you arrive at your understanding
10    of the parameters of this proposed transaction?
11        A.    By listening and reading.
12        Q.    Let's break that up.
13              By listening to whom?
14        A.    To discussions and participating in
15    them, and then by reading what was finally
16    prepared.
17        Q.    Who was involved in the discussions that
18    you listened to and participated in, if you can
19    recall?
20        A.    The clients, I guess, and on rare
21    occasions their accountant, and on rarer occasions
22    Michael.
23        Q.    Who was their accountant?
24        A.    I don't recall -- Ken Gould.
25                MR. ZIMMERMAN:  I was just going to note
```

REPORTERS CENTRAL * (212) 594-3582

25
```
 1    Sheldon Silverberg - Rough Draft
 2        for the record to ask the witness to be
 3        sensitive to the attorney-client privilege as
 4        he answers these questions.
 5            THE WITNESS:  I though that you were
 6        going to object.
 7            MR. SCHACHTER:  I will as is
```

0721NEWT.TXT
```
 8        appropriate.
 9            I just want you to be sensitive to it so
10        you don't volunteer information that might
11        constitute information that is protected by
12        the privilege in response to a question
13        which is not --
14            MR. SCHACHTER:  I will jump in, too.
15            THE WITNESS:  Somebody should jump in if
16        I am doing that.
17            Have I done it?
18            MR. ZIMMERMAN:  No, you have not.
19            THE WITNESS:  All right.
20            MR. ZIMMERMAN:  I am just asking you to
21        be sensitive and not to volunteer information
22        that is not directly responsive.
23        Q.   What, if any, work were you to perform
24    in connection with consummating this proposed
25    transaction?
```

REPORTERS CENTRAL * (212) 594-3582

26
```
 1    Sheldon Silverberg - Rough Draft
 2            MR. ZIMMERMAN:  Objection.
 3        A.   We were doing what we thought was
 4    necessary to get a proper contract.
 5        Q.   To clarify, would that be, among other
 6    things, reviewing contracts and proposed
 7    contracts?
 8        A.   Yes.
 9        Q.   Did your work in connection with the
10    transaction include advising Northwest of
```

0721NEWT.TXT

11     potential ramifications of the transaction?

12          A.     Yes.

13               MR. JENSEN:  Would you mark this

14          document as Silverberg Exhibit 5, please.

15               (Silverberg Exhibit 5, three-page

16          document, the first page being a telecopier

17          cover sheet on the stationery of Silverberg

18          Stonehill & Goldsmith, P.C., dated December

19          29, 2005, to Martha J. Flanders, from Michael

20          Beer, Bates stamped Nos. SSGH 00751 through

21          SSGH 00753, marked for identification, as of

22          this date.)

23     BY MR. JENSEN:

24          Q.    I am handing you a document that we have

25     marked as Exhibit 5.


                REPORTERS CENTRAL * (212) 594-3582


                                                           27
1          Sheldon Silverberg - Rough Draft

2               I would like you to take a look at that

3     and tell us if you recognize it, Mr. Silverberg.

4               MR. SCHACHTER:  Is there a question?

5               MR. JENSEN:  Yes.

6          Q.    Do you recognize this document?

7          A.    I now recognize it, yes, but I don't

8     recall writing it.

9          Q.    Do you have any reason to think that you

10     did not write it?

11          A.    No.

12               MR. JENSEN:  Would you mark this

13          document as Silverberg Exhibit 6, please.

                          **Page 24**

0721NEWT.TXT

```
14        (Silverberg Exhibit 6, two-page printout
15    of e-mail string, the top e-mail dated
16    November 6, 2005, to Sheldon Silverberg, from
17    Michael Beer, Bates stamped Nos. SSGH 00430
18    and SSGH 00431, marked for identification, as
19    of this date.)
20 BY MR. JENSEN:
21    Q.   I am now handing you a document that has
22 been marked as Silverberg Exhibit 6.
23        I would like you to take a look at this
24 document and tell us if you recognize it.
25    A.   Yes.
```

REPORTERS CENTRAL * (212) 594-3582

28
```
 1    Sheldon Silverberg - Rough Draft
 2    Q.   Can you describe for us what this
 3 document is?
 4    A.   It seems to be an e-mail of a discussion
 5 of a letter of intent sent by Michael Beer to me.
 6    Q.   To your knowledge, does this e-mail
 7 summarize the terms of this transaction as it was
 8 original contemplated between the potential
 9 parties to the transaction?
10    A.   It seems to, but I don't recall all of
11 the numbers.
12    Q.   If I could direct your attention
13 specifically to the second page of this document,
14 there is a line that begins with the number 3).
15    A.   Yes.
16    Q.   To your knowledge, was Ross Auerbach
```

0721NEWT.TXT

17    personally obligated on bank guarantees that

18    pertained to loans issued to or for the benefit of

19    Northwest?

20        A.    I think that all of the guarantees had

21    not yet been released at that time.

22        Q.    To clarify, at the time of this e-mail,

23    it was your understanding that all of his

24    guarantees had been released?

25        A.    No, I don't think that they all had been

REPORTERS CENTRAL * (212) 594-3582

29

1        Sheldon Silverberg - Rough Draft

2    released yet.

3            There were guarantees that had been

4    released, but I don't think that all of them had

5    been released.

6        Q.    Do you have any knowledge of the terms

7    and conditions of the personal guarantees that not

8    been released?

9        A.    I don't recall the exact details, but

10    personal guarantees and obligations to pay a debt.

11            I think that you are -- yes, that is

12    all.

13        Q.    To clarify, when you say it's an

14    obligation to pay a debt, you would be referring

15    to a debt of Northwest?

16        A.    Right.

17        Q.    It is your understanding that in the

18    event Northwest could not pay its debts, Ross

19    Auerbach could have been held liable for amounts

0721NEWT.TXT
20    that had been distributed to him by Northwest?
21          MR. ZIMMERMAN:  Objection.
22          MR. SCHACHTER:  Objection.
23      A.   I don't think that that is what that
24    refers to.
25          MR. JENSEN:  Would you mark this

REPORTERS CENTRAL * (212) 594-3582

30
1     Sheldon Silverberg - Rough Draft
2       document as Silverberg Exhibit 7, please.
3           (Silverberg Exhibit 7, seven-page letter
4       agreement dated January 5, 2006, to The
5       Northwest Company, Inc., Attention: Ross
6       Auerbach, Bates stamped Nos. SSGH 00058
7       through SSGH 00064, marked for
8       identification, as of this date.)
9   BY MR. JENSEN:
10      Q.   Mr. Silverberg, I am now going to show
11    you a document that has been marked as Exhibit 7.
12          I would like you to take a look at this
13    document and tell us if you recognize it.
14      A.   Yes, I do.
15      Q.   What is this document?
16      A.   It's a letter of intent to purchase the
17    shares of stock of The Northwest Company to the
18    extent of 80 percent.
19      Q.   Are you aware of any terms or conditions
20    that were discussed between the parties pertaining
21    to this proposed transaction that contravened
22    anything that is set forth in this letter of
                    Page 27

0721NEWT.TXT

23    intent?

24          MR. ZIMMERMAN:  Objection.

25      A.    You would have to be more specific.


REPORTERS CENTRAL * (212) 594-3582


                                                    31

1      Sheldon Silverberg - Rough Draft

2    There is too much for me to answer a general

3    question.

4      Q.    Mr. Silverberg, if I could refer you to

5    page 4 of this document, if you will look at the

6    second paragraph on this page, it starts with the

7    letter (i), just so that the record is clear, can

8    I ask you to read this sentence?

9      A.    "The Buyer shall have obtained the

10   financing necessary to consummate the transactions

11   contemplated by this letter of intent."

12     Q.    Do you recall any discussions that

13   occurred between the parties with regard to this

14   aspect of the transaction at the time that this

15   letter of intent was being consummated?

16     A.    No, I don't recall.

17     Q.    Does reviewing this portion of this

18   document refresh your recollection as to whether

19   or not it was originally contemplated that the

20   proposed transaction would not involve borrowing?

21          MR. SCHACHTER:  Could you repeat the

22      question, please?

23          (Question read.)

24     A.    The proposed transaction at the time of

25   the signing of the letter of intent contained this

                    Page 28

0721NEWT.TXT

REPORTERS CENTRAL * (212) 594-3582

32

1        Sheldon Silverberg - Rough Draft

2    provision.

3        Q.    Do you recall that earlier today you

4    testified that the transaction as originally

5    contemplated was not going to involve borrowing?

6        A.    No.

7        Q.    Do you recall whether Michael Beer

8    contributed to the content of this letter of

9    intent?

10       A.    I don't know what you mean by that.

11       Q.    Do you recall whether there were any

12   provisions or terms of this letter of intent that

13   Michael Beer either requested or made changes or

14   suggestions to?

15       A.    I don't recall.

16            MR. SCHACHTER:   In about five minutes we

17       need a five-minute break.

18            MR. JENSEN:   Sure.

19            Off the record.

20            (Discussion off the record.)

21            MR. JENSEN:   Back on the record.

22            Would you mark this document as

23       Silverberg Exhibit 8, please.

24            (Silverberg Exhibit 8, seven-page

25       document, the first page being printout of

REPORTERS CENTRAL * (212) 594-3582

0721NEWT.TXT

33

1        Sheldon Silverberg - Rough Draft
2          e-mail dated December 20, 2005, to Ross
3          Auerbach, from Peter Mansour, Bates stamped
4          Nos. SSGH 00444 through SSGH 00450, marked
5          for identification, as of this date.)
6    BY MR. JENSEN:
7        Q.   Mr. Silverberg, I am now going to show
8    you a document marked as Exhibit 8.
9             I would ask you to take a look at that
10   briefly and tell us if you recognize it.
11       A.   It's another copy of a letter of intent.
12       Q.   To your knowledge, was this the final
13   letter of intent or was it a draft or discussion
14   version of that letter of intents?
15       A.   I don't recall.
16       Q.   I ask you to turn to the page bearing
17   the No. 4, and if you could look at paragraph 5,
18   which starts, "Expenses.," quickly read over that
19   paragraph, please.
20       A.   Yes.
21       Q.   Does this refresh your recollection as
22   to whether or not Michael Beer suggested language
23   or terms that were to be included in the letter of
24   intent?
25       A.   No.


                REPORTERS CENTRAL * (212) 594-3582


                                                    34
1        Sheldon Silverberg - Rough Draft
2        Q.   Let's turn back to the very beginning of
3    this document, which has been marked SSGH 00444.

0721NEWT.TXT

```
 4              Do you know who Peter Mansour is?
 5         A.   He was my secretary.
 6         Q.   Looking at the caption to this message,
 7    is this a message that was sent either by you or
 8    on your behalf?
 9         A.   Yes.
10         Q.   Can you identify the persons who
11    received this message?
12         A.   The message was intended for Ross
13    Auerbach, with a copy to Michael Beer.
14         Q.   Was Shay Auerbach also an intended
15    recipient?
16         A.   Yes, Shay Auerbach.
17         Q.   Turning back now to this page marked as
18    4, and again looking at this paragraph 5, do you
19    see towards the bottom there is some underlined
20    text?
21         A.   On page 5?
22         Q.   On page 4 in paragraph 5.
23         A.   Yes.
24         Q.   Do you see that it says, "...[Michael
25    Beer to fill in..."?
```

REPORTERS CENTRAL * (212) 594-3582

                                                    35
```
 1         Sheldon Silverberg - Rough Draft
 2         A.   Yes.
 3         Q.   When you sent this document, what was
 4    your understanding of the meaning of that phrase,
 5    "Michael Beer to fill in"?
 6         A.   That Michael Beer would fill it in.
```

0721NEWT.TXT

```
 7              MR. JENSEN:  Let's go ahead and take a
 8        break.
 9              (Off the record).
10              (Short recess taken.)
11              MR. JENSEN:  Back on the record.
12              Would you mark this document as
13        Silverberg Exhibit 9, please.
14              (Silverberg Exhibit 9, one-page letter
15        agreement on the stationery of Silverberg
16        Stonehill & Goldsmith, P.C., dated December
17        22, 2005, to Shay Auerbach, from Sheldon
18        Silverberg, Bates stamped No. NW 00801,
19        marked for identification, as of this date.)
20   BY MR. JENSEN:
21        Q.   Mr. Silverberg, we are handing you a
22   document that has been marked as Exhibit 9.
23              I would like you to take a look at that
24   document and tell us if you recognize it.
25        A.   I do.
```

REPORTERS CENTRAL * (212) 594-3582

36

```
 1        Sheldon Silverberg - Rough Draft
 2        Q.   What is this?
 3        A.   It's a letter to Shay Auerbach at
 4   Northwest asking for him and Ross to confirm that
 5   they have no objection to our participation in the
 6   finder's fee.
 7        Q.   Did you ever make an agreement with
 8   Michael Beer for payment of part of his finder's
 9   fee?
```

0721NEWT.TXT

10          A.    At the time that Michael went into

11    business and I was offering him a couple of our

12    clients, I told him that we generally participate

13    in the finder's fee, and he said, "I will pay you

14    what anybody else pays you," and that was the only

15    agreement that we had.

16          Q.    Is it your testimony, then, that there

17    was never any definite agreement that was reached

18    between you and Mr. Beer regarding what share of

19    his fee would be payable to you?

20          A.    He said that he would pay me what

21    anybody else would pay me and that was the

22    understanding.

23          Q.    What were other persons paying you?

24          A.    In the past, our firm participated to

25    the extent of one-third to one-half of the

REPORTERS CENTRAL * (212) 594-3582


                                                        37

1     Sheldon Silverberg - Rough Draft

2     finder's fee.

3           Q.    Did Mr. Beer ever offer any specific

4     amount of that finder's fee to you?

5           A.    Yes, he did, down the line when the deal

6     looked like it may be consummated.

7           Q.    What is it that he offered you?

8           A.    He offered us 5 percent of the fee.

9           Q.    What, if anything, was your response to

10    that offer?

11          A.    I told him that we were not interested

12    and that we would not take any of it.

0721NEWT.TXT

```
13              MR. JENSEN:  Would you mark this
14          document as Silverberg Exhibit 10, please.
15              (Silverberg Exhibit 10, blank-page
16          document, the first page being printout of
17          e-mail dated June 15, 2006, to Michelle
18          Mansour and others, from Martha J. Flanders,
19          Bates stamped Nos. SSGH 01297 through SSGH
20          01366, marked for identification, as of this
21          date.)
22     BY MR. JENSEN:
23          Q.   Mr. Silverberg, I have handed you a
24     document marked as Exhibit 10.
25              I ask you to take a look over that and
```

REPORTERS CENTRAL * (212) 594-3582

38

```
1       Sheldon Silverberg - Rough Draft
2     tell us if you recognize this document.
3              MR. SCHACHTER:  Do you want him to go
4          through every single page of this?
5              MR. JENSEN:  It would probably be a lot
6          easier to thumb through it.
7              I am not playing any games.
8              MR. SCHACHTER:  I understand that.
9          A.   What was question?
10         Q.   Do you recognize this document?
11         A.    It appears to be the proposed purchase
12    of asset agreement.
13         Q.   If you look at the first page of this
14    document, the e-mail, do you see a paragraph that
15    starts, "From a tax efficiency stand point..."?
```

Page 34

0721NEWT.TXT

16        A.   Yes.

17        Q.   Did you or your firm ever do any work in

18   connection with the issue of whether or not a

19   seller would obtain rollover treatment for its 20

20   percent as discussed in this paragraph?

21        A.   I know that I did not, but I don't

22   recall if anybody did.

23        Q.   Again, do you see on the same page where

24   it says "Schematic"?

25        A.   Yes.


REPORTERS CENTRAL * (212) 594-3582


39
1        Sheldon Silverberg - Rough Draft

2        Q.   Below that, for the sake of clarity, can

3   you read that sentence that begins, "As you can

4   see..."?

5        A.   Yes.

6        Q.   Do you know if it was ever communicated

7   to Wolf Block or to SIG that Northwest did not

8   agree that the letter of intent permitted the

9   transaction to be structured as an asset purchase

10   rather than a stock purchase?

11        A.   What was the first part of that

12   question?

13        Q.   Do you know if it was ever communicated

14   to Wolf Block or SIG that the letter of intent did

15   not permit that?

16        A.   I don't think that it was communicated

17   that the letter of intent did not permit it.

18             I think that it was communicated that
                      Page 35

0721NEWT.TXT

19    the letter of intent did not intend that.

20         Q.    Turning two pages in, to a page that is

21    marked SSGH 01299, with regard to this document

22    and the pages that follow it in this exhibit, were

23    you involved in reviewing or drafting or

24    commenting upon this document?

25              MR. ZIMMERMAN:  Objection.


                 REPORTERS CENTRAL * (212) 594-3582


                                                    40
1         Sheldon Silverberg - Rough Draft

2              You can answer.

3         A.    Only to the extent that I read it and

4    attended the first meeting.

5         Q.    Would you turn to the page marked SSGH

6    01360.

7              MR. ZIMMERMAN:  1360?

8              MR. JENSEN:  1360.

9              MR. ZIMMERMAN:  Thanks.

10        Q.    If you could look over the portions of

11    this document that are captioned "Schedule 1.2(A)"

12    and "Schedule 1.2(B)," do you have any

13    recollection of any discussions that took place

14    between any of the parties to this proposed

15    transaction that concerned what liabilities would

16    be transferred in the transaction and what

17    liabilities would be retained by Northwest?

18        A.    No, I do not.

19        Q.    Do you know of any liabilities that were

20    not to be transferred in the transaction?

21        A.    I don't recall.

                    Page 36

0721NEWT.TXT

22          I don't recall that there were any not
23      to be transferred.
24          MR. JENSEN:  Would you mark this
25      document as Silverberg Exhibit 11, please.


REPORTERS CENTRAL * (212) 594-3582


                                              41
 1      Sheldon Silverberg - Rough Draft
 2          (Silverberg Exhibit 11, two-page
 3          printout of e-mail string, the top e-mail
 4          dated June 19, 2006, to Sheldon Silverberg
 5          and Peter Mansour, from Martha J. Flanders,
 6          Bates stamped Nos. SSGH 00786 and SSGH 00787,
 7          marked for identification, as of this date.)
 8      BY MR. JENSEN:
 9          Q.   If you would take a look at this
10      document marked Exhibit 11, can you tell us if you
11      recognize it?
12          A.   Only to the extent of what it appears to
13      be, but I don't recall it.
14          Q.   Looking at the bottom of the first page
15      of this document, towards the bottom of the first
16      page of this document, do you see a message from
17      Peter Mansour on behalf of Sheldon Silverberg to
18      Martha J. Flanders?
19          A.   Yes.
20          Q.   Do you see where it says, "Our client
21      has instructed us to do no further work in this
22      matter"?
23          A.   Yes.
24          Q.   First of all, did there come a point in
                    Page 37

0721NEWT.TXT

25      time when you communicated to the other parties to

REPORTERS CENTRAL * (212) 594-3582

42

1          Sheldon Silverberg - Rough Draft
2      this transaction that you had now been instructed
3      to resume work in the matter?
4          A.   I am looking at this and it tells me
5      that we did.
6               MR. SCHACHTER:  Would you repeat the
7          question, please.
8               (Question read.)
9          A.   Resume work?
10              No, I don't recall.
11         Q.   So is it your understanding, then, that
12     work was never resumed after June 19, 2006?
13         A.   I don't recall the date on which we
14     finally did the work.  I can't tell you that.
15         Q.   To your knowledge, was work resumed at
16     some point after this message?
17         A.   I don't know.
18         Q.   Do you know if there was any other time
19     that you or someone acting on your behalf
20     communicated to the other parties that you would
21     you not be doing any further work on the matter?
22         A.   I don't know.
23         Q.   To your knowledge, who would know
24     whether or not work was resumed?
25         A.   I would guess that the people who were

0721NEWT.TXT

43

```
 1       Sheldon Silverberg - Rough Draft
 2    then working on it were my son Jay and Michael
 3    Goldsmith.
 4              I don't know when they exactly stopped
 5    and didn't do anything further.
 6         Q.   Would they also have knowledge of
 7    whether there were ever any other communications
 8    made that there was to be no further work done on
 9    the matter?
10         A.   I don't know.
11         Q.   Who would know that?
12         A.   Michael Goldsmith and my son Jay.
13         Q.   Are you aware of any licensers that do
14    or did business with Northwest?
15         A.   A great many of them -- Northwest had a
16    great many licenses.
17         Q.   Can you name the licensers that you can
18    recall?
19         A.   They had the International Football
20    League, Disney and every movie character that was
21    popular at the time; a list that endlessly went on
22    and on.
23              MR. JENSEN:  Would you mark this
24         document as Silverberg Exhibit 12, please.
25              (Silverberg Exhibit 12, three-page
```

REPORTERS CENTRAL * (212) 594-3582

44

```
 1       Sheldon Silverberg - Rough Draft
```

0721NEWT.TXT

2          memorandum on the stationery of Wolf Block,

3          dated July 10, 2006, to Sheldon Silverberg,

4          from Jill S. Linker, Bates stamped Nos. SSGH

5          00801 through SSGH 00803, marked for

6          identification, as of this date.)

7     BY MR. JENSEN:

8          Q.   Would you take a look at this document

9     that we have marked as Exhibit 12 and would you

10    tell us if you recognize this document.

11         A.   I don't recall it.

12         Q.   Do you know if any license documents

13    were provided to Wolf Block or to SIG in

14    connection with this contemplated transaction?

15         A.   I don't know.

16         Q.   Do you know if there were ever any

17    discussions that took place with any of the

18    Northwest licenses regarding the contemplated

19    transaction?

20         A.   I don't know.

21         Q.   Are these matters that your son Jay and

22    Mr. Goldsmith would presumably know?

23         A.   I don't think that Michael Goldsmith

24    would know, but my son Jay might be.

25              MR. JENSEN:  Would you mark this


              REPORTERS CENTRAL * (212) 594-3582


                                              45
1      Sheldon Silverberg - Rough Draft

2          document as Silverberg Exhibit 13, please.

3               (Silverberg Exhibit 13, one-page

4          printout of e-mail string, the top e-mail

0721NEWT.TXT
```
 5          dated September 20, 2006, to Michael Beer,

 6          from Daniel Werther, Bates stamped No.

 7          NTC0029, marked for identification, as of

 8          this date.)

 9     BY MR. JENSEN:

10          Q.   Would you take a look at this document

11     that has been marked as Silverberg Exhibit 13, and

12     would you tell us if you recognize any portion of

13     it.

14          A.   All right.

15          Q.   Do you see at the bottom portion of this

16     page there is a message from Stacy Karp to

17     Martha Flanders?

18          A.   Yes.

19          Q.   Do you have any recollection of this

20     portion of the message?

21          A.   No.

22          MR. JENSEN:  Would you mark this

23          document as Silverberg Exhibit 14, please.

24          (Silverberg Exhibit 14, one-page letter

25          on the stationery of Silverberg Stonehill
```

REPORTERS CENTRAL * (212) 594-3582

46
```
 1     Sheldon Silverberg - Rough Draft

 2          Goldsmith & Haber, P.C., dated September 19,

 3          2006, to Martha J. Flanders, from Jay

 4          Silverberg, Bates stamped No. SSGH 00239,

 5          marked for identification, as of this date.)

 6     BY MR. JENSEN:

 7          Q.   If you would look at the document that
```

0721NEWT.TXT

```
 8    has been marked as Exhibit 14, do you recognize
 9    this document?
10         A.   No.
11         Q.   Is it your understanding that on
12    approximately September 19th of 2006 your firm
13    communicated that there had been no meeting of the
14    minds as to the proposed SIG transaction and that
15    your office was going to close its files?
16         A.   I know what happened, but I don't recall
17    exactly when.
18         Q.   But to clarify, you do recall that it
19    was communicated that there had been no meeting of
20    the minds and that the files were being closed?
21         A.   I don't recall, but I know what
22    happened.
23         Q.   Do you recall any conversations that
24    occurred with any of the parties to this
25    transaction regarding whether there had been a
```

REPORTERS CENTRAL * (212) 594-3582

47

```
 1         Sheldon Silverberg - Rough Draft
 2    meeting of the minds?
 3         A.   I wasn't handling the matter during the
 4    summer of that year.
 5              I know a lot of work was being done to
 6    try to resurrect the deal, but I wasn't involved
 7    with it.
 8              MR. JENSEN:  Would you mark this
 9         document as Silverberg Exhibit 15, please.
10              (Silverberg Exhibit 15, one-page letter
```

Page 42

0721NEWT.TXT

```
11          on the stationery of Silverberg Stonehill
12          Goldsmith & Haber, P.C., dated November 15,
13          2006, to James T. Smith, from Michael B.
14          Goldsmith, Bates stamped No. SSGH NTC0036,
15          marked for identification, as of this date.)
16   BY MR. JENSEN:
17          Q.   Would you take a look at this document
18   that has been marked as Exhibit 15, please.
19          A.   All right.
20          Q.   Looking at this document that has been
21   marked as Exhibit 15, do you recognize this
22   document?
23          A.   No.
24          Q.   If you could quickly read over this
25   document, do you have any knowledge of the matters
```

REPORTERS CENTRAL * (212) 594-3582

48
```
1        Sheldon Silverberg - Rough Draft
2    that are expressed in this document?
3               MR. ZIMMERMAN:  Objection.
4        A.   What was the question?
5             (Question read.)
6        A.   Yes, I do.
7        Q.   Did you ever speak with Mr. Goldsmith
8    regarding this document?
9        A.   No, I did not.
10       Q.   What is it that you have knowledge of
11   regarding the document?
12       A.   I have knowledge of the facts that are
13   recited in it, and why the deal was not
```
**Page 43**

0721NEWT.TXT

14    consummated.
15        Q.   Looking at the second paragraph of this,
16    which begins, "while it is not my intention...,"
17    do you see the last sentence of that paragraph,
18    which reads, "Months later as the transaction
19    'evolved,' it became a highly leveraged asset sale
20    that raised serious questions by all sides
21    (including the prospective buyer) that Northwest
22    was selling into a fraudulent conveyance?
23        A.   Yes.
24        Q.   Do you have any knowledge of that
25    statement?

REPORTERS CENTRAL * (212) 594-3582

49
1        Sheldon Silverberg - Rough Draft
2        A.   I don't have any knowledge of the
3    statement as it appears in the letter, but I have
4    knowledge of the facts that led up to it, yes.
5        Q.   What facts is it that you are aware of
6    that led up to that statement?
7        A.   As a result of the sale and the high
8    interest loans that were going to be part of the
9    balance sheet and the service of the debt, that
10    the ongoing company would not be creditworthy of
11    enough credit to successfully continue its
12    operations, and that if it did not or could not,
13    the clients might have to refund the money that
14    they have already received.
15            Not refund, but turn it over.
16        Q.   Do you know if the prospective buyer

Page 44

0721NEWT.TXT
```
17    ever raised that issue?
18         A.   With whom?
19         Q.   With anyone.
20         A.   I don't know.
21         Q.   Were you ever a party to any
22    communications in which the prospective buyer
23    raised that concern?
24         A.   No.
25         Q.   For what reason or reasons might the
```

REPORTERS CENTRAL * (212) 594-3582


50
```
1         Sheldon Silverberg - Rough Draft
2    Auerbachs have had to turn over the amounts that
3    they had been paid?
4              MR. SCHACHTER:  Are you asking him to
5         speculate?
6              MR. JENSEN:  I am asking him what he
7         knows.
8              MR. SCHACHTER:  Would you reread the
9         question.
10             (Question read.)
11        A.   If their creditors were unpaid and this
12    was found to be a fraudulent conveyance.
13        Q.   Do you know if there were ever any
14    concerns with provisions of the bankruptcy code,
15    such as the provisions pertaining to preferential
16    transfers and fraudulent transfers, if you know?
17        A.   Repeat the question, please.
18             (Question read.)
19        A.   I know that there was concern, yes.
```
**Page 45**

0721NEWT.TXT

20      Q.   How is it that you know that there were
21   those concerns?
22      A.   Because of the discussions that were
23   going on with Jay and Michael.
24      Q.   Were you a participant in any of these
25   discussions?

REPORTERS CENTRAL * (212) 594-3582

51
1        Sheldon Silverberg - Rough Draft
2      A.   No.
3      Q.   Besides Jay, was there anyone else in
4   Silverberg Stonehill who, to your knowledge, was a
5   participant in these discussions?
6      A.   Yes, Michael Goldsmith, who signed this
7   letter.
8           MR. JENSEN:  Would this be a good time
9      for another break?
10           MR. SCHACHTER:  Sure.
11           MR. JENSEN:  Off the record.
12           (Discussion off the record.)
13           (Short recess taken.)
14           MR. JENSEN:  Back on the record.
15   BY MR. JENSEN:
16      Q.   Can we go back to the document that was
17   marked as Exhibit 3?
18      A.   All right.
19      Q.   Looking at the bottom portion of this
20   message, do you recall receiving this message from
21   Mr. Auerbach?
22      A.   No, I don't recall receiving it.

Page 46

0721NEWT.TXT
```
23        Q.   Looking up to the upper portion of the
24   message, do you recall a telephone conversation
25   that you had with, among other persons,
```

REPORTERS CENTRAL * (212) 594-3582

52
```
 1       Sheldon Silverberg - Rough Draft
 2   Mr. Auerbach?
 3        A.   I recall a telephone conversation with
 4   him on the subject.  I don't recall when.
 5        Q.   Do you recall who else was involved in
 6   that telephone conversation?
 7        A.   I don't think that anybody else was
 8   involved in this telephone conversation with me.
 9            MR. ZIMMERMAN:  Do you want to clarify
10        whether or not it was just Shay Auerbach or
11        Ross Auerbach or --
12            MR. JENSEN:  Let's do that.
13        Q.   Which Auerbach or Auerbachs were on the
14   other end of that conversation?
15        A.   I don't recall.
16        Q.   Do you recall any conversations you had
17   with Shay Auerbach or with Ross Auerbach that
18   precipitated this message from Shay Auerbach?
19        A.   Yes.
20        Q.   What were those?
21        A.   I recall a conversation that I had with
22   Shay Auerbach when he told me that his --
23            MR. SCHACHTER:  I think that he is going
24        to say something.
25            MR. ZIMMERMAN:  This, I presume, relates
```
Page 47

0721NEWT.TXT

REPORTERS CENTRAL * (212) 594-3582

53
1        Sheldon Silverberg - Rough Draft
2        to -- I should not assume anything.
3            MR. SCHACHTER:  I have to tell you what
4        I think that it relates to, so you can decide
5        whether there is a privilege.
6            MR. ZIMMERMAN:  That is fine.
7            Excuse us.
8            (At this time, Mr. Schachter and
9        Mr. Zimmerman left the deposition room to
10        confer and then returned.)
11            (At this time, Mr. Schachter and the
12        witness left the deposition room to confer
13        and then returned.)
14        Q.   Do you need the question read back?
15        A.   No.
16            I started to say that I recall a
17    conversation with Shay Auerbach in which he told
18    me, while doing his will, his tax attorney was
19    asked to read the proposed agreement, who then
20    told him that there is a fraudulent conveyance
21    question in this deal, and that he should not go
22    forward with it.
23        Q.   Do you recall if Shay Auerbach used the
24    term "Fraudulent conveyance"?
25        A.   I don't recall what term he used, but

REPORTERS CENTRAL * (212) 594-3582

Page 48

0721NEWT.TXT

54

1          Sheldon Silverberg - Rough Draft
2    from what he said, that was what I understood it
3    to be, and it was an item that was under
4    consideration in our office at that time.
5          Q.   Let me break this apart.
6               Do you know who the tax attorney is who
7    Mr. Auerbach had spoken with?
8          A.   It was a partner in Moses & Singer.
9          Q.   Do you know who that was?
10         A.   No.
11         Q.   Can you elaborate on the concerns in
12   your office on that point?
13         A.   On that point, there was a discussion
14   going on between Jay Silverberg and Michael
15   Goldsmith on the thinly capitalized ongoing
16   company.
17         Q.   Looking again back up to the top part of
18   this message, for what reason or reasons did you
19   send this reply?
20         A.   To try to communicate to the client the
21   way that the deal could be salvaged.
22         Q.   Do you see where it says, "...the only
23   protection would be..."
24         A.   Yes.
25         Q.   What were you attempting to protect

REPORTERS CENTRAL * (212) 594-3582

55

1          Sheldon Silverberg - Rough Draft
2    against?
3          A.   Fraudulent conveyance.

0721NEWT.TXT

4      Q.    Was there anything else?

5      A.    Not at that point, no.

6            There were a lot of other things

7      involved in the contract, but that was the point

8      that he had called to discuss.

9      Q.    Reading on here, it says, "...the only

10     protection would be a significantly more

11     substantial initial capital infusion into the

12     acquiring company..."

13           Can you explain how that would have

14     protected against that risk?

15     A.    If there were less borrowings put on the

16     book and more equity put in the company, this deal

17     would not have rendered the acquiring company

18     insolvent and unable to pay its bills.

19     Q.    Continuing on, "...and a meaningful

20     indemnity from all of the Susquehanna Companies,

21     not just the acquiring company."

22     A.    It would indemnify it against just such

23     a contingency, and by somebody other than the

24     acquiring shell, Susquehanna, the parent company,

25     they would have some protection.


REPORTERS CENTRAL * (212) 594-3582


                                                  56
1      Sheldon Silverberg - Rough Draft

2      Q.    Would either of these options have

3      eliminated that risk?

4      A.    The indemnity would not have eliminated

5      the risk, but it would have taken the risk away

6      from the individuals in returning the money.  It

0721NEWT.TXT

```
 7      would place the burden on Susquehanna.
 8              Depending upon how much of a meaningful
 9      increase in the capital, if it was substantial
10      enough, it would eliminate the risk.
11          Q.   Did you do any legal research before
12      sending this message?
13          A.   Did I?
14               No.
15          Q.   Did anyone from Silverberg Stonehill?
16          A.   Well, Jay was handling the matter and he
17      was in the process of discussing it with Michael
18      Goldsmith when this question arose as a result of
19      an outside attorney.
20          Q.   Do you know what legal research was
21      done?
22          A.   I don't know if any legal research had
23      to be done.  Michael Goldsmith is quite an expert
24      in that area.
25          Q.   Did you consult with Mr. Goldsmith
```

REPORTERS CENTRAL * (212) 594-3582

57
```
 1      Sheldon Silverberg - Rough Draft
 2      before you sent this message?
 3          A.   I did not, no, but my son Jay had.
 4          Q.   My next question is, did you consult
 5      with Jay before you sent this message?
 6          A.   I don't recall, but I am reasonably sure
 7      that I did.
 8          Q.   What was the basis for the advice that
 9      you put forward in this message?
```

0721NEWT.TXT

10       A.   Jay's discussion with Michael.

11            This was an ongoing discussion at the

12       time that our client was told by another attorney

13       about the problem with the deal.

14       Q.   Do you know if Moses & Singer did any

15       research, legal research, in connection with these

16       matters?

17       A.   I don't know.

18       Q.   Can you describe what a "fraudulent

19       conveyance" is, to your knowledge?

20       A.   This deal contemplated that the ongoing

21       company would be liable for all of the debts

22       incurred as a result of the financing in order to

23       make the deal happen, as a result of which it

24       would probably be rendered insolvent, and if

25       unable to pay its obligations, the transfer of the

REPORTERS CENTRAL * (212) 594-3582

58

1       Sheldon Silverberg - Rough Draft

2       assets could be considered a fraudulent

3       conveyance.

4            MR. JENSEN:  I think for the record that

5            I need to object that that was not

6            responsive.

7       Q.   Can you provide a summary or a synopsis

8       of the legal elements leading to the conclusion

9       that something is a fraudulent conveyance?

10       A.   I think that I just did.

11       Q.   Did you ever reach the conclusion that

12       this proposed transaction was intended to defraud

Page 52

0721NEWT.TXT

13      the creditors of Northwest?

14          A.   Did I ever reach that conclusion?

15               No.

16          Q.   Do you know if anyone from your firm

17      reached that conclusion?

18          A.   I think that two of my partners did.

19          Q.   Which partners reached that conclusion?

20          A.   Michael Goldsmith and Jay Silverberg.

21          Q.   Do you know if that conclusion was ever

22      put in writing?

23          A.   To whom?

24          Q.   To anyone.

25          A.   It seems to be in writing right here

REPORTERS CENTRAL * (212) 594-3582

                                                    59
1          Sheldon Silverberg - Rough Draft

2      (indicating).

3          Q.   Besides this document, was it ever put

4      in writing?

5          A.   I don't know.

6          Q.   Do you know what creditors it was

7      concluded the transaction was intended to defraud?

8          A.   I did not say that the transaction was

9      intended to defraud.

10              I said if the client became unable to

11      pay its debts, then that conclusion could possibly

12      be reached in the future, if it was rendered

13      insolvent by the transfer of these assets.

14          Q.   Then let me see if I can clarify this.

15              Do you know if you or anyone from your

0721NEWT.TXT

16    firm ever reached the conclusion that this

17    proposed transaction was actually, as opposed to

18    implied in the law, intended to defraud the

19    creditors of Northwest?

20         A.   Say that again.

21         Q.   Let me break it apart here.

22              Did you or did anyone from your firm

23    reach the conclusion that this proposed

24    transaction was actually subjectively intended to

25    defraud the creditors of Northwest?

REPORTERS CENTRAL * (212) 594-3582

                                             60
1         Sheldon Silverberg - Rough Draft

2         A.   I don't think so.

3         Q.   Would it be fair to say that the intent

4    to defraud element would have been on the basis of

5    an intent that is presumed in the law rather than

6    an actual intent?

7         A.   I think it's something that would have

8    developed in the course of future events, and I

9    don't think that there was an intent to defraud.

10   I think that it may have come about as a result of

11   the inability of this company to properly conduct

12   its business.

13        Q.   Can you explain how the finding of a

14   fraudulent conveyance is impacted by whether or

15   not there is an actual versus a presumed intent to

16   defraud creditors?

17        A.   I don't know the answer to that.

18        Q.   Did you ever reach the conclusion or did

0721NEWT.TXT

19    anyone from your firm ever reach the conclusion

20    that the price being paid to Northwest in

21    connection with this proposed transaction was not

22    fair consideration?

23        A.   I don't think that there was any problem

24    with the price.  The price was not a problem.

25        Q.   Do you know if any other lawyers or law

REPORTERS CENTRAL * (212) 594-3582

61

1        Sheldon Silverberg - Rough Draft

2    firms reached any of these conclusions that we

3    have been talking about?

4        A.   No, I don't know.

5        Q.   Did you discuss intent to defraud or

6    fair consideration with any other lawyers or law

7    firms?

8        A.   Did I?

9             No.

10        Q.   Do you know if anyone at your firm did?

11        A.   I don't know.

12        Q.   Are you familiar with the publication

13    called "New York Jurisprudence 2d"?

14        A.   Not really.

15        Q.   Have you heard of it?

16        A.   Yes.

17             MR. JENSEN:  Would you mark this

18        document as Silverberg Exhibit 16, please.

19             (Silverberg Exhibit 16, four-page

20        excerpt from New York Jurisprudence 2d,

21        "Creditors' Rights and Remedies," marked for

0721NEWT.TXT

22        identification, as of this date.)

23    BY MR. JENSEN:

24        Q.    Would you look over this exhibit that we

25    have marked as Exhibit 16.


REPORTERS CENTRAL * (212) 594-3582


62

1        Sheldon Silverberg - Rough Draft

2        A.    All right.

3        Q.    First of all, what is your understanding

4    of the content of the publication New York

5    Jurisprudence 2d?

6        A.    I don't have any real understanding of

7    it.  I am not a research person.

8        Q.    Do you understand it to be a treatise on

9    the topic of New York law?

10       A.    I don't know what it is.

11            MR. ZIMMERMAN:  I am going to object to

12        this whole line of questioning.

13            Obviously, you are welcome to do it, but

14        I will stipulate that New York Jurisprudence

15        2d is a treatise on New York law.

16            I think it's unfortunate to subject this

17        witness to a line of inquiry as to what a

18        research tool is or is not.

19            I am just noting that for the record.

20        You are free to continue.

21       Q.    If we turn in this to the section --

22            MR. SCHACHTER:  I am going to say

23        something else.

24            We are not here to test the witness'

0721NEWT.TXT
25          knowledge of fraudulent conveyances.


                REPORTERS CENTRAL * (212) 594-3582


                                                    63
 1      Sheldon Silverberg - Rough Draft
 2              You can ask the witness what happened
 3          factually, but you are not going to get his
 4          opinion on the law.
 5              You can ask him questions of fact, but
 6          he is not here to give opinions.
 7              MR. JENSEN:  I will not be asking for
 8          his opinion.
 9              MR. SCHACHTER:  All right.
10      Q.   If you would look at section 366, in the
11      first paragraph, I am going to go ahead and read
12      tit into the record.
13              "Where a new corporation is formed for
14      the purpose of hindering, delaying, or defrauding
15      creditors, a transfer to it of the property of a
16      debtor is void as to such debtor's creditors.
17      Such a transfer may be fraudulent as to creditors
18      despite a lack of actual intent to cheat; however,
19      a transfer will not be set aside where the newly
20      organized corporation paid an adequate
21      consideration without any intent either to delay
22      or defraud creditors."
23              Do you know if the advice that was
24      transmitted in Exhibit 3 took account of the
25      statement of the law that I just read off of this

0721NEWT.TXT

64

1        Sheldon Silverberg - Rough Draft
2    exhibit?
3        A.    I don't know.
4        Q.    Do you recall if you had other
5    communications with Ross or Shay Auerbach from
6    approximately the same time as the e-mail messages
7    that have been marked as Exhibit 3?
8        A.    I don't recall.
9        Q.    If we can go back to the document marked
10    as Exhibit 2, I recall that you said that you did
11    not recognize this document.
12        A.    Yes.
13        Q.    However, I would like to identify a few
14    specific entries on this document and simply ask
15    whether or not you recall any of the matters that
16    would have been discussed in those communications.
17            The first group that I would like to
18    identify are a series of communications numbered
19    29 through 40, dated July 26 and 25, 2006.
20            MR. JENSEN:  Off the record.
21            (Discussion off the record.)
22            MR. JENSEN:  Back on the record.
23        Q.    Mr. Silverberg, with regard to this
24    e-mail that we have marked as Exhibit 3, do you
25    recall any other conversations that took place

REPORTERS CENTRAL * (212) 594-3582

65

1        Sheldon Silverberg - Rough Draft

0721NEWT.TXT

2   with Ross and/or Shay Auerbach and you or anyone

3   from your firm at or about this same time period?

4        A.   I don't recall, but I know that there

5   were a lot of open issues that were eventually put

6   into a memo by Jay Silverberg.

7        Q.   Do you know if that memo was produced in

8   this litigation?

9        A.   I don't know.

10       Q.   Do you know what other issues were

11  addressed in that memo?

12       A.   I don't recall.

13       Q.   Would it be fair to say that the memo

14  addressed issues other than fraudulent conveyance?

15       A.   It addressed issues other than the

16  fraudulent conveyance and all other issues that we

17  had with the proposed asset purchase agreement.

18       Q.   Did anyone from Northwest ever express

19  to you that they had decided that they just did

20  not want to go through with the transaction?

21       A.   I don't recall if it was expressed to me

22  or to Jay, but it was expressed and resulted in

23  the correspondence to Martha Flanders.

24       Q.   When was this first expressed, do you

25  recall?

REPORTERS CENTRAL * (212) 594-3582

66

1      Sheldon Silverberg - Rough Draft

2        A.   I don't recall.

3             I know that you showed me a couple of

4   e-mails or letters that we sent indicating that

0721NEWT.TXT

5    there was no further work to be done.

6        Q.    Do you recall if that was expressed

7    prior to the time of the e-mails that we have

8    marked as Exhibit 3?

9        A.    The final one was sent long after that.

10       Q.    For the purpose of making sure that our

11   record is as clear as it can be, if you would turn

12   back to this privilege log marked as Exhibit 2, I

13   want to clarify that you don't know what matters

14   were discussed in the items listed as Nos. 21

15   through 40, aside from the issues that we have

16   just discussed?

17           MR. SCHACHTER:  Are you asking whether

18       he knows what was addressed in these e-mails?

19           MR. JENSEN:  Aside from the fraudulent

20       conveyance point that we have been

21       discussing.

22       A.    So far I see everything is dated July

23   25th.

24           Were all of these e-mails on one day?

25           Here is July 26th.


REPORTERS CENTRAL * (212) 594-3582


                                                67
1       Sheldon Silverberg - Rough Draft

2           I don't know about anything else.

3        Q.    On the next page, Nos. 56 and 57, is it

4    the same response, you don't know what else would

5    have been discussed?

6        A.    It's also on the same day.

7           No, I don't recall.

0721NEWT.TXT

```
 8        Q.    The last one is No. 64.
 9        A.    No.
10        Q.    Looking at this document, the e-mails
11   marked Exhibit 3, do you recall if you asked or
12   instructed Shay Auerbach to send you this message?
13        A.    I don't recall ever asking him to send
14   me a message.
15        Q.    Do you know if Jay Silverberg or
16   Mr. Goldsmith did?
17        A.    I don't know, but I would doubt it.
18        Q.    Had either Shay or Jay Auerbach raised
19   this issue of exposure to Ross and myself prior to
20   sending this e-mail?
21             MR. ZIMMERMAN:  I think that the
22        question confused the names of the parties.
23             You might want to re-ask it.
24             MR. JENSEN:  I think that you are right.
25        Q.    Do you know if Ross or Shay Auerbach
```

68

```
 1        Sheldon Silverberg - Rough Draft
 2   communicated with you regarding concern about
 3   exposure to either of them prior to sending you
 4   this message?
 5        A.    I don't recall the exact chronology of
 6   events, no.
 7        Q.    Do you remember if this message was the
 8   first notice or alert that you had received of
 9   this issue?
10        A.    I don't recall.
```

0721NEWT.TXT

11          Q.    Do you know if you or anyone from your

12    office reviewed any of the New York debtor and

13    creditor law prior to sending this message of

14    July 26, 2006?

15          A.    I don't know.

16          Q.    To clarify your answer, you don't know

17    whether anyone reviewed that?

18          A.    Yes.

19          MR. JENSEN:  Would you mark these

20          documents as Silverberg Exhibits 17 and 18,

21          please.

22          (Silverberg Exhibit 17, two-page

23          printout of e-mail string, the top e-mail

24          dated September 22, 2006, to David Pollard,

25          from Alberta Caron, Bates stamped No. MS


REPORTERS CENTRAL * (212) 594-3582


                                                    69
1     Sheldon Silverberg - Rough Draft

2          0091, marked for identification, as of this

3          date.)

4          (Silverberg Exhibit 18, two-page

5          printout of e-mail string, the top e-mail

6          dated September 19, 2006, to Jay Silverberg,

7          from Ross Auerbach, Bates stamped Nos. SSGH

8          00244 and SSGH 00245, marked for

9          identification, as of this date.)

10    BY MR. JENSEN:

11          Q.    Would you take a look at the documents,

12    Mr. Silverberg, that have been marked as Exhibits

13    17 and 18.

0721NEWT.TXT

14      A.   Yes.

15      Q.   Do you recognize either or both of these

16  messages?

17      A.   What was the question?

18      Q.   Do you recognize either or both of these

19  messages?

20      A.   No.

21      Q.   Let's look at Exhibit 17, fax 1.

22      A.   Yes.

23      Q.   Do you see that there is a message from

24  Ross Auerbach to Daniel Werther?

25      A.   Yes.


REPORTERS CENTRAL * (212) 594-3582


                                                        70
1       Sheldon Silverberg - Rough Draft

2       Q.   Do you see a portion of this message

3   that begins, "You are a super guy..."?

4            I will just read it.

5       A.   I see it.

6       Q.   "You are a super guy who has tried to

7   put a deal together with all the best intentions,

8   but we needed a deal that closes with all equity."

9       A.   Yes, I see.

10      Q.   First of all, do you have any

11  understanding of what the term "all equity" means?

12      A.   No.

13      Q.   Did you consult or discuss any of the

14  matters set forth in this message with Ross or

15  Shay Auerbach?

16      A.   I don't think so.

0721NEWT.TXT

17          Q.   To your knowledge, did these discussions

18     address whether or not the deal would be

19     acceptable if it was all equity?

20          MR. ZIMMERMAN:  Objection.

21          A.   I don't even know what that means.

22          Q.   Do you have any idea why Ross did not

23     say, "We need an indemnity from Susquehanna," or

24     "We need more capital infused into the new

25     company"?

REPORTERS CENTRAL * (212) 594-3582


                                                   71

1          Sheldon Silverberg - Rough Draft

2               MR. ZIMMERMAN:  Objection.

3          Q.   Do you have any idea why he did not say

4     that?

5          A.   That discussion was happening at the

6     beginning of July.

7               I don't know what was happening in

8     September about that because, as far as I know,

9     the clients were dealing directly together without

10    us.

11              MR. JENSEN:  Would you mark this

12              document as Silverberg Exhibit 19, please.

13              (Silverberg Exhibit 19, one-page

14              printout of e-mail dated August 15, 2006, to

15              Shay Auerbach, from Peter Mansour, Bates

16              stamped No. SSGH 00984, marked for

17              identification, as of this date.)

18    BY MR. JENSEN:

19         Q.   Would you look at this document marked

                         Page 64

0721NEWT.TXT

```
20    as Exhibit 19, Mr. Silverberg.
21         A.   Yes.
22         Q.   Do you recognize this?
23         A.   I vaguely remember it, yes.
24         Q.   Do you see the first sentence, where it
25    says, "We assume from your silence that
```

REPORTERS CENTRAL * (212) 594-3582

72
```
 1         Sheldon Silverberg - Rough Draft
 2    negotiations have terminated"?
 3         A.   Yes.
 4         Q.   What negotiations were you referring to?
 5         A.   We had told Shay what he needed to make
 6    this deal good, and to make every effort to
 7    accomplish it, and he was continuing discussions
 8    with the purchaser to try to achieve that.
 9              We had not heard anything, I guess, for
10    a period of time, so I wrote this note to him.
11         Q.   What needed to be negotiated that wasn't
12    already addressed in the letter of intent?
13         A.   The infusion of equity or the
14    substantial indemnity that was required to make it
15    safe for our clients.
16         Q.   Was there anything else?
17         A.   Oh, there were a whole bunch of things
18    in the contract, but that was between Jay and
19    Martha Flanders.
20         Q.   Who would know who matters were
21    continuing to be negotiated at the time of this
22    message?
```

0721NEWT.TXT
23        MR. ZIMMERMAN:  Objection.

24        A.    Jay would know what items were open on

25    his memo and Shay would know how he was getting

REPORTERS CENTRAL * (212) 594-3582

73
1        Sheldon Silverberg - Rough Draft

2    along with Mr. Werther.

3        Q.    Would Mr. Goldsmith also have that

4    knowledge?

5        A.    Mr. Goldsmith may have that knowledge,

6    but I don't know.

7        Q.    If we could go back to Exhibit 3 one

8    more time, this e-mail, did Ross or Shay Auerbach

9    ever communicate to you or, to your knowledge, to

10   the firm that the issue expressed in this e-mail

11   was not their sole concern?

12       A.    With respect to consummating this

13   proposed transaction?

14             I don't know if they knew of the other

15   open items between the lawyers, so I can't tell

16   you because Jay was really handling the contract,

17   and he was in discussions with Shay, and Michael

18   was in discussions with Shay about the other

19   problems, so I don't know.

20       Q.    But no one ever said that to you; is

21   that right?

22       A.    That this was their sole concern?

23             Yes, nobody ever said that to me.

24       Q.    That this was not their sole concern.

25             MR. ZIMMERMAN:  Objection.

**Page 66**

0721NEWT.TXT

REPORTERS CENTRAL * (212) 594-3582

74
1       Sheldon Silverberg - Rough Draft

2          A.   Did they ever tell me that this was

3    their sole concern or that this was not their sole

4    concern?

5          Q.   That this was not their sole concern;

6    that there were other concerns.

7          A.   We had other concerns.

8               We, as attorneys, had other concerns

9    about the contract.

10              This was the main concern of the

11   clients.

12         Q.   Can you describe what the other concerns

13   were?

14         A.   No, I can't.

15              There was a memo that Jay was handling

16   with Martha Flanders.

17         Q.   With regard to that memo from Jay, do

18   you know about what time that was written?

19         A.   No, I don't.

20         Q.   Do you know is it was approximately the

21   same time as this e-mail we have been discussing

22   that is marked as Exhibit 3?

23         A.   I don't know.

24              MR. JENSEN:  I think that that is all

25              that I have.

REPORTERS CENTRAL * (212) 594-3582

0721NEWT.TXT
                                                              75
1         Sheldon Silverberg - Rough Draft
2              THE WITNESS:  Thank you.
3              MR. JENSEN:  I appreciate your time,
4         Mr. Silverberg.
5              MR. SCHACHTER:  Thank you.
6              MR. ZIMMERMAN:  No questions.
7              MR. JENSEN:  Off the record.
8              (Discussion off the record.)
9              (Time noted:  12:50 p.m.)
10
11
12              SHELDON SILVERBERG
13
14    Subscribed and sworn to before me
15    this    day of              , 2008.
16
17
18    (Notary Public)              My Commission Expires:
19
20
21
22
23
24
25


              REPORTERS CENTRAL * (212) 594-3582


                                                              76
1         Sheldon Silverberg - Rough Draft
2                   C E R T I F I C A T E
3         STATE OF NEW YORK     )

0721NEWT.TXT

4                          : ss.

5   COUNTY OF NEW YORK    )

6          I, SUSAN B. RATNER, a Shorthand Reporter

7   and a Notary Public within and for the State of

8   New York, do hereby certify that the foregoing

9   deposition of SHELDON SILVERBERG was taken before

10  me on the 21st day of July, 2008;

11          That the said witness was duly sworn before

12  the commencement of his testimony; that the said

13  testimony was taken stenographically by me and

14  then transcribed.

15          I further certify that I am not related

16  by blood or marriage to any of the parties to this

17  action or interested directly or indirectly in the

18  matter in controversy; nor am I in the employ of

19  any of the counsel in this action.

20          IN WITNESS WHEREOF, I have hereunto set

21  my hand this XXXXX day of July, 2008.

22

23

24                    SUSAN B. RATNER

25


          REPORTERS CENTRAL * (212) 594-3582


                                          77
1     Sheldon Silverberg - Rough Draft

2   July 21, 2008

3

4                    I N D E X

5   WITNESS               EXAMINATION BY      PAGE

6   SHELDON SILVERBERG    MR. JENSEN

0721NEWT.TXT

```
 7
 8     -------------INFORMATION REQUESTS--------------
 9     DIRECTIONS (DI):
10     INSERT
11     RULINGS (RL):
12     REQUESTS (RQ):
13     CERTIFIED (CE):
14     MOTIONS (MO):
15
16                    E X H I B I T S
17     SILVERBERG #                         FOR IDENT
18
19     1 - Three-page document, the first page being a
20     "Subpoena in a Civil Case," dated 2/5/2008, to
21     Silverberg Stonehill Goldsmith & Haber, P.C... 11
22
23
24
25
```

REPORTERS CENTRAL * (212) 594-3582

```
                                              78
 1        Sheldon Silverberg - Rough Draft
 2     2 - Document three-page bearing the heading
 3     "Response to Subpoena dated February 5, 2008,
 4     Issued to Silverberg Stonehill Goldsmith & Haber,
 5     P.C.,"....................................... 13
 6
 7     3 - One-page printout of e-mail string, the top
 8     e-mail dated July 26, 2006, to Shay Auerbach and
 9     others, from Sheldon Silverberg,  Bates stamped
```

0721NEWT.TXT

10    No. NW 00856.................................. 13

11

12    4 - Four-page memorandum on the stationery of

13    Moses & Singer LLP, dated July 27, 2006, to Shay

14    Auerbach and Ross Auerbach, from Steven Glaser,

15    Bates stamped Nos. NW 00863 through NW 00866... 14

16

17    5 - Three-page document, the first page being a

18    telecopier cover sheet on the stationery of

19    Silverberg Stonehill & Goldsmith, P.C., dated

20    December 29, 2005, to Martha J. Flanders, from

21    Michael Beer, Bates stamped Nos. SSGH 00751

22    through SSGH 00753............................ 26

23

24

25

REPORTERS CENTRAL * (212) 594-3582

79

1       Sheldon Silverberg - Rough Draft

2     6 - Two-page printout of e-mail string, the top

3     e-mail dated November 6, 2005, to Sheldon

4     Silverberg, from Michael Beer, Bates stamped Nos.

5     SSGH 00430 and SSGH 00431..................... 27

6

7     7 - Seven-page letter agreement dated January 5,

8     2006, to The Northwest Company, Inc., Attention:

9     Ross Auerbach, Bates stamped Nos. SSGH 00058

10    through SSGH 00064............................ 30

11

12    8 - Seven-page document, the first page being

0721NEWT.TXT

13   printout of e-mail dated December 20, 2005, to

14   Ross Auerbach, from Peter Mansour, Bates stamped

15   Nos. SSGH 00444 through SSGH 00450............ 33

16

17   9 - One-page letter agreement on the stationery of

18   Silverberg Stonehill & Goldsmith, P.C., dated

19   December 22, 2005, to Shay Auerbach, from Sheldon

20   Silverberg, Bates stamped No. NW 00801........ 35

21

22

23

24

25

REPORTERS CENTRAL * (212) 594-3582

80

1       Sheldon Silverberg - Rough Draft

2    10 - blank-page document, the first page being

3    printout of e-mail dated June 15, 2006, to

4    Michelle Mansour and others, from Martha J.

5    Flanders, Bates stamped Nos. SSGH 01297 through

6    SSGH 01366.................................. 38

7

8    11 - Two-page printout of e-mail string, the top

9    e-mail dated June 19, 2006, to Sheldon Silverberg

10   and Peter Mansour, from Martha J. Flanders,  Bates

11   stamped Nos. SSGH 00786 and SSGH 00787........ 41

12

13   12 - Three-page memorandum on the stationery of

14   Wolf Block, dated July 10, 2006, to Sheldon

15   Silverberg, from Jill S. Linker, Bates stamped

Page 72

0721NEWT.TXT

16      Nos. SSGH 00801 through SSGH 00803............ 44
17
18      13 - One-page printout of e-mail string, the top
19      e-mail dated September 20, 2006, to Michael Beer,
20      from Daniel Werther, Bates stamped
21      No. NTC0029.................................. 46
22
23
24
25


            REPORTERS CENTRAL * (212) 594-3582


                                                        81
1         Sheldon Silverberg - Rough Draft
2       14 - One-page letter on the stationery of
3       Silverberg Stonehill Goldsmith & Haber, P.C.,
4       dated September 19, 2006, to Martha J. Flanders,
5       from Jay Silverberg, Bates stamped No.
6       SSGH 00239.................................. 46
7
8       15 - One-page letter on the stationery of
9       Silverberg Stonehill Goldsmith & Haber, P.C.,
10      dated November 15, 2006, to James T. Smith, from
11      Michael B. Goldsmith, Bates stamped No. SSGH
12      NTC0036..................................... 48
13
14      16 - Four-page excerpt from New York Jurisprudence
15      2d, "Creditors' Rights and Remedies".......... 52
16
17      17 - Two-page printout of e-mail string, the top
18      e-mail dated September 22, 2006, to David Pollard,
                        Page 73

0721NEWT.TXT

19    from Alberta Caron, Bates stamped No.

20    MS 0091....................................... 70

21

22    18 - Two-page printout of e-mail string, the top

23    e-mail dated September 19, 2006, to Jay

24    Silverberg, from Ross Auerbach, Bates stamped Nos.

25    SSGH 00244 and SSGH 00245..................... 70

REPORTERS CENTRAL * (212) 594-3582

82

1      Sheldon Silverberg - Rough Draft

2    19 - One-page printout of e-mail dated August 15,

3    2006, to Shay Auerbach, from Peter Mansour, Bates

4    stamped No. SSGH 00984....................... 73

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

0721NEWT.TXT

22
23
24
25

REPORTERS CENTRAL * (212) 594-3582